Mr. George. May it please the Court. My name is David George and I represent the appellants, the creditors Edward Talone and the Edward Talone Trust No. 1. Edward Talone is a 71-year-old man who has worked as a geophysicist in the oil and gas industry for the last four decades. Anloc hired him to perform reservoir analysis and other geotechnical work. Mr. Talone performed and provided the labor that he was hired to do, but he has not been paid for his work. The bankruptcy court determined that Mr. Talone could not be paid because it determined that he was illegally practicing engineering without a license. The bankruptcy court's determination was clearly erroneous because as a geophysicist working in the oil and gas industry, Mr. Talone was exempt from the Texas Engineering Practices Act, which I'll probably refer to as TIPA from time to time, their licensing requirements. And this court, therefore, should reverse the bankruptcy court order disallowing Talone's in that court. The Texas Engineering Practices Act is central to this case, and that act regulates the practice of engineering, of course, and it sets forth what is engineering. Statute has incredibly broad definitions of engineering, and including a catch-all provision that anything used to, necessary for the professional services, necessary for planning progress or completion of an engineering service would be considered engineering. That has the ability to capture a lot of work that would not normally be considered engineering and that would not be done by licensed engineers in its net. If someone is practicing engineering without a license, they are prohibited from recovering a fee. So it's very important. Somebody, if you fall under the statute and you're prohibited, you can't have a fee unless you fall under an exemption. And because the statute is so broad, the exemptions are very important. The exemption in this case that applies is what they call the geophysicist or geoscientist exemption. The bankruptcy court disallowed the exemption and said Mr. Talone could not take advantage of it because it made the determination that he had, quote, you know, offered to the public to perform engineering services, as the statute reads. The statutory regime under the Engineering Practices Act says that if you offer to the public to perform engineering services, you cannot take advantage of an exemption. So there's, if you practice engineering and fall under that broad definition, you can still have an exemption. It's only those people who, quote, offer to the public to perform engineering services, only that subcategory, that is prohibited from using an exemption. The bankruptcy court, once it made that determination, any chance for an exemption went away. And that determination was clearly erroneous. And the determination was based on two pieces of evidence. The first is what we call the sharing agreement. And that was a contract that was entered into between Mr. Talone and Anlock, where he would be paid 10% interest in certain wells in return for his work. That's the document that made the statement about in the petroleum engineering business. That document was filed in the Harris County public records. The bankruptcy court took the position that because a contract between two parties that mentioned something about engineering services was filed in the public records, that counted as an offer to the public to perform engineering services. And we don't think there's any basis under the statute to hold that. Now, there's no case law on this. This is, as most of the issues in this case, for whatever reason, have never been determined by any court. So we don't have any cases interpreting it. But if you just look at the plain language, if you offer to the public to provide engineering services, that sounds like advertising. If somebody has an ad saying Joe Smith engineers, runs an ad saying I offer engineering services, you know, you're open for the business of engineering to the public. That would be an offer to the public. Here, just the statement in a contract that the public may or may not be, well, the public theoretically could look at, is not an offer to the public. The second ground is the statement by the president and owner of Anlock, the debtor, a man named Kalouris, that Talone supposedly told investors at meetings, or potential investors, that he was a licensed engineer. There are two problems with that for the bankruptcy court opinion. First, to even rely on that was clearly erroneous. Mr. Kalouris is a person the bankruptcy court expressly found was a liar. It basically said he was a habitual liar. He will say whatever he needs to say at any time. They found that in the opinion and in the hearing makes that statement. And it's very important as to his credibility, Mr. Kalouris says that Mr. Talone told me he was an engineer. I thought he was an engineer. He was always representing himself to be an engineer. And then in that same section, about page 1494 to 1500 of the record, that same area is where he says, and we went to meetings and he told everybody he was an engineer. Well, the problem with that, besides the fact he has been a judicially determined liar, so how can the court rely on him? That testimony in itself is demonstrably false as to the statements that Mr. Talone had held himself out to them as an engineer in the sense that Anlock admits that it had his resume. And his resume is included as Exhibit I. In September of 2009, Anlock had Mr. Talone's resume, which clearly says he has a physics degree, makes no mention of engineering, never says or makes no mention of having an engineering license, in no way says he's an engineer. And so at the same time, Mr. Kalouris is stating that, you know, oh, we all thought he was an engineer. It had documents that proved that's not true. And so given the fact that all that, those deep, deep questions about Mr. Kalouris telling the truth, it was an error for the bankruptcy court to rely on that. That's the only fact supporting the idea that he held himself out to investors as an engineer. Second, and in addition, even if Mr. Kalouris' testimony were sufficient evidence that that happened, the fact that Mr. Talone told investors at a meeting that he was an engineer would not be enough to count as offering to the public to perform engineering services. Mr. Talone, if this court were to determine Mr. Kalouris' testimony is sufficient evidence, he would be an employee or an agent of a company meeting with potential oil and gas investors. That was not an offer for Mr. Talone to perform any service for those people, and it was not an offer for Anlock to perform a service. This was an offer for people to invest money in exchange for the chance to receive income if oil well is profitable. And that is very far removed from the statutory language of offer to the public to perform engineering services. Next, I'll turn to the issue of the exemption. Because Mr. Talone did not offer to the public to perform engineering services, he potentially can take advantage of an exemption. The exemption that would apply here is the geophysicist exemption, the 1001.059. And that is the one that says that a qualified scientist engaged in scientific research and investigation of the physical and natural sciences is exempt from the licensing requirements. And most important, the exemption then says this exemption includes the usual work and activities of a physicist or geophysicist, as well as others. Mr. Talone testified that what he did was the usual work of a geophysicist. There's no evidence that it was not. Mr. Koulouris is not an engineer, nor he has no degree. He has no professional training. And he did not testify even that this is not what geophysicists do. There was nobody. What did the bankruptcy court specifically find as to whether his services were those of a geophysicist or exceeded that? The bankruptcy court, I think, what it really said was, this is another way of saying that he wasn't practicing engineering or something to that effect. Well, didn't the court — I'm asking you just to get information, not to be argumentative. Yes. But didn't the court refer to that it applied to only some of his services were within the scope or some were not? The bankruptcy court, in the opinion, talked about that it may have — some of this may have been geophysicist, but in essence, it was also engineering. And it made the — tried to make the distinction that this is engineering, this is geophysicist. There's no evidence on that point. And the bankruptcy court was taking the position that if you did what was engineering, it couldn't then be geophysicist. And the problem with that is the nature of the exemption — if you're not doing engineering, you don't need an exemption. The exemption only applies if you're doing stuff that counts as engineering. So the fact that Mr. Talone was doing services that may have been engineering as well as geophysicist doesn't mean he's not entitled to the exemption. It's the only reason he needs the exemption. And — Is it fair to try to make this distinction that whatever he was doing was more or less in-house rather than holding himself out, I'll be an engineer for anybody that wants to come to my office? I think that's — I think that is a big distinction that — whether you offer yourself out to the public. The idea is if someone is hired by someone as an in-house, you know, as a staff person, you may be practicing engineering and need an exemption. But in that case, you're not offering yourself out to the public. And when I think of offering myself out to the public, that — really, that — the statute sounds like advertising. On the geophysicist, there's no evidence that came in as to, you know, this type of work would not be geophysicist. And the bankruptcy court didn't list and say this was geophysicist, this was not geophysicist. It sort of said that's also engineering. But that's okay. It can be engineering as well, as long as it's the usual work. And you look at this. Physicist, geophysicist, geologist, engineer. These — there's a lot of overlap in this behavior. When you're out there in the real world, the lines aren't clear. But as long as you're doing what's the usual work of a geophysicist, you can have the exemption. Anlock takes the position that the exemption applies only to scholarly pursuits, I believe is the term they used. And because Mr. Talone was not — I think the way they described it was, you know, investigating new laws of geophysics or trying to rework old laws. And instead, he was involved in a commercial enterprise that couldn't apply. There's no statutory basis for the idea that the geoscientist exception applies only to those engaged in academic scholarly work. The statute says in the two-sentence exemption that includes the usual work of physicists and geophysicists. I think we showed that within the — the people graduating with geoscience degrees, 50 percent go work for industry. A quarter — How close is the work between a petroleum engineer and a geophysicist? I mean, is it hard to determine? Is there a fine line between what one does and what the other does? Well, here there was an engineer. They had a petroleum engineer. And the engineer would be the one actually doing the drilling. They construct and design the system and actually do it. Mr. Talone, in his — the way he describes it in the sharing agreement, for example, in his testimony is that he provided technical well support. So the engineer, the — and we look at petroleum engineer, that also is a broad term. There's drilling engineer, reservoir engineer. There's a lot of different ones. But here there was a drilling engineer, a man who was there the whole time, David LaRue. So they had a drilling engineer. They needed a geoscience person. The drilling engineer would actually do the — this is how we actually drill. Now, Mr. Talone came in and helped interpret the well logging. He was familiar with the geology of this particular formation. And so he knew where certain things will be done. There is a lot of overlap. I think given the nature of it, it's hard to say, you know, where does one end and one begin? Much like if you have a physician, a physician assistant, a nurse. Clearly some things are nursing only. Some things are physician only. But there's a — you know, if your doctor comes in and changes your dressing, that's — is that a nursing, is that a physician task? There's a lot of overlap. But we think — clearly there's testimony what he did with geoscientist work. Roberts. Okay, Mr. George. You've saved time for rebuttal. Thank you. Mr. Yorke. Yorke. May it please the Court. My name is Alan Yorke, and I'm here today representing Analog LLC, who was the debtor below and is the appellee before this Court. As the Court is aware from reading the party's briefs and hearing the arguments, there are basically two issues involved in this appeal. The first is the application of TEPA to the services that Mr. Colon provided. And the second is the validity of an alleged pre-petition transfer or assignment of carried working interest. At this point, though, I think it's important procedurally to understand — take a moment to look at what really is at issue in this appeal and what is not, because I think there's some confusion perhaps in some of the briefing. So to clear some of that up, a couple of things. Following the Judge Isker's ruling in this case and pending the appeal, the parties negotiated an agreement whereby Mr. Colon would not have to post an appeal bond to appeal this case. And as a part of that corrected agreement, which is a part of the record, Mr. Colon specifically waived his claim number 23, which was the collection of any money under the $300,000 claim. There is some reference to that in the briefing, and I just wanted to be clear with the Court. Now, when you refer to that one, is that the one that depends on whether the acknowledgment on the document? No, Judge Weiner. That's actually the carried working interest assignment. This is a separate — this was claim 23 in the bankruptcy proceeding. Okay. It was one that Mr. Colon filed. But the one is still alive about the assignment. The assignment issue is still alive. And the point that we would make about the assignment issue, and then this is a point that we have some contention on in the brief, is whether the TEPA issue is dispositive of the assignment issue. Mr. Colon says it's not. Anlock has argued that it is. And the thing that I would point out to the Court is that when the appeal was taken from this judgment, Judge Isker entered a specific order in the adversary proceeding abating the adversary proceeding. Anlock's position is that if TEPA is, in fact, affirmed by this Court as barring any recovery for compensation to Mr. Colon for the engineering services he provided, that will ultimately be dispositive of the adversary proceeding and the carried working interest. Nonetheless, it probably does make sense for this Court to look at both issues because it's easier to dispose of both at the same time. The last thing that I want to make sure that it's clear that it's off the table is any allegation that there was a prepetition conveyance that was conveyed under the sharing agreement. Now, this is important because the sharing agreement, which we're going to talk about a little bit more in a moment, was specifically drafted by Mr. Colon, and it was drafted in January of 2010 and purported to convey to him a 10 percent carried working interest. In his reply brief, Mr. Colon continues to argue that he is still arguing for that 10 percent assignment under the sharing agreement. However, at page 13 of his initial brief in note 66, Mr. Colon specifically says that he is not contesting the bankruptcy court's ruling that the sharing agreement was not a prepetition transfer. So from AMLOC's standpoint, the $300,000 claim, claim number 23, is out. Any allegation that there was a prepetition conveyance as a result of the sharing agreement is out, and any argument regarding the carried working interest is going to be necessarily subject to the bankruptcy court's further determination in the adversary proceeding in which we believe the TEPA ruling will ultimately be dispositive. But what is at issue are the two issues that I named at the beginning, and that is whether TEPA operates as an exclusion to the remaining claim, claim 22, for the engineering services that Mr. Colon provided. And secondarily, whether there was a valid assignment of any carried working interest as a result of the assignment. Now, a couple of points that were not specifically mentioned by Mr. Colon in his argument, and they're key points, and the bankruptcy court found them to be key points. The sharing agreement that I mentioned just a moment ago, which was executed in January 2010, was authored, no contest, by Mr. Colon. And one of the very first lines in that sharing agreement written by Mr. Colon states, Mr. Colon is in the business of petroleum engineering. The court found that this representation by Mr. Colon was, in fact, an offer to the public to provide engineering services. He's providing, writing a contract to ANLOC, a member of the public, and saying, I'm in the business of providing petroleum engineering services. So what we have here, based on the briefing of the parties, under TEPA, is an acknowledgement by Mr. Colon that if, in fact, he was providing engineering services without a license, he's barred from recovery. Well, what if there's a difference between I am a licensed engineer and I'm engaging in engineering services, and it falls over into the geophysicist distinction? Well, I think as the court has recognized, Judge Wiener, there is not a bright line distinction between, perhaps in this situation, things that might be services that a geophysicist normally provides, things that an engineer might normally provide. But I think what the court has to do is look at the underlying purpose of TEPA. And I think if the court looks at that underlying purpose, the purpose is, clearly, there are exemptions that are outlined in TEPA that would allow someone who doesn't do anything other than say, hey, I'm a geophysicist, this is what I do, and there's a way to get to the geophysicist exemption. But this was a contract between two parties where he says I do these engineering services. That's not hanging out a shingle or putting it in the yellow pages. No, Judge Wiener, and I don't think that the statute requires that. The specific wording of the statute with regard to the limitation on the exemptions, and this is where it becomes important because Mr. Talone's argument basically boils down to, even if what I was doing was engineering services, it falls under the geophysicist exemption. But what the statute says is an exemption under the subchapter applies only to a public. This is a contract between private parties. That's correct, Your Honor, but a private party is a member of the public. ANLOC is a member of the public, and I think that Mr. Talone reads too much into the statute when he says that what the statute really intends is that someone not be able to go out and advertise engineering services. We have two specific instances that the court below found did constitute an offer to the public to provide engineering services. The first, as I say, is a representation from Mr. Talone himself in his own words saying, that's what I do. I provide engineering services. Now, if what we had was him just coming in and saying, hey, guys, I'm a geophysicist. I'm going to provide you services of a geophysicist, then we would have a very different situation here. But what he did was he said, I provide petroleum engineering services and protection of the public from unlicensed engineers representing that they're qualified to provide engineering services is one of the underlying purposes of TEPA. Now, the second thing that the bankruptcy court looked at were the representation to investors, and there are a number of layers of arguments here, but the bankruptcy court did find that Mr. Talone affirmatively went to ANLOC's investors, represented that he was an engineer, was providing engineering services. Now, can we say that Mr. Talone was offering to provide those engineering services specifically to these investors? No. It is correct that what he was doing was representing that he was a petroleum engineer in order to obtain the investors' investment into ANLOC, but the statement that this was based solely upon the testimony of Mr. Kalluris is just not correct. In fact, the bankruptcy court cited specific words and language specifically used by Mr. Talone himself, again, saying that when he entered into these agreements, he did so because he recognized that ANLOC was in need of engineering services and in need of someone to go to their investors to show that they had an engineer on duty, that they had someone doing these things, and that that was the role he intended to fill. And so the statement that all this was simply based on Mr. Kalluris' testimony is simply not correct. There is additional testimony in the evidence specifically from Mr. Talone himself. Moreover, the argument that everything that Mr. Kalluris said with regard to the nature of these services and them being engineering services needs to simply be disregarded is simply not the case here. This Court has noted on several occasions, and we've cited the cases in our case, that the credibility of the witnesses becomes very important. And in a case like this, I don't believe that the judgment of the bankruptcy court who sat and listened to the witnesses and made a judgment on their credibility could be any different. This is not a case of a tale of the hun versus a pack of nuns. This is a case of some oil field guys, one of which whom is accused and painted a liar before this Court by Mr. Talone. But it cannot be gone without recognition that Mr. Talone admittedly, in two separate occasions, specifically altered documents without authorization in order to have them filed in the real property records. So this is a situation in which I think the standard of review really defeats much of Mr. Talone's arguments because the idea that the bankruptcy court did not take into account all of these factors in making his ultimate determination based upon the credibility of the witnesses simply defies logic. Now, we've … Does it make any difference on that point that this was an LLC and not a corporation? Well, Your Honor, that really specifically goes, I think, to the assignment issue. Right. And I don't think it makes any difference whatsoever. If you look at Texas Property Code Section 12.001, which requires that any acknowledgement be according to law. And then you look at the acknowledgement that was actually used on the assignment. The acknowledgement that was used on the assignment was a short-form acknowledgement outlined in Section 121.008 for a natural person. Now, also under Section 121.008, there are additional forms of acknowledgement to be used, for example, for a partnership, for a corporation, for someone acting as attorney. In fact, all of those require that the acknowledgement include additional language stating that the person who is actually executing the document is doing so with the authority of the entity involved. If you also look at the Texas Business and Corporations Code, when it defines what an LLC is, the Business and Corporations Code defines an LLC as having the powers and authorities of a corporation and a Texas limited partnership. So while their 121.008 does not necessarily provide a specific form for an LLC, one thing is clear. An LLC is not a natural person. It is clear that Mr. Kaluurs, whatever was at the bottom in block print, Enlock LLC Michael Kaluurs, was insufficient as determined by the clerk of the property records. We know that for a fact because the clerk declined to file that assignment when it was initially presented to her because it did not conclude the authority language. So we know— There's no such thing in the Texas law of third-party dependence on these that would be called, let's say, substantial compliance. It has to be a technically correct acknowledgement, even though it's sitting there for the world to see. That's absolutely correct, Your Honor. And one of the cases that I would point the Court to that I think is especially instructive on this, because when you read Mr. Talone's arguments in his brief, the arguments almost come across as, well, okay, he added that information, but after he added that information, it still got filed. And the fact that it got filed should be enough to constitute either constructive or at least inquiry notice. I would point the Court to the case that we cite in our brief, Countrywide Home Loans. It's an Austin Court of Appeals case in 2007. And that case is instructive because it deals with the situation in which, in that case, there was not an allegation of a technical defect in the acknowledgement. Instead, what the Court was dealing with was a notice of lispendence. But what the Court did in that case that I think is instructive is it looked not just to the four corners of the document that was filed and said, yes, this was technically correct, and therefore, it serves as constructive notice. Instead, what it did was it looked behind the document to say the pleadings that were on file that served as the basis of this lispendence sought only a constructive trust and did not seek an interest in the real property. And therefore, the lispendence, while technically correct, was not with proper basis and could not serve as constructive notice. Well, isn't that just the reverse of this? Nobody's looking at the substance of this. They're looking at only the technical compliance with the acknowledgement. But I think the difference there, Your Honor, is the allegation of the infirmity in the document. In the Countrywide Home Loans case, the Court was looking at an allegation that there was simply no basis for the lispendence because it – there was no – there were no pleadings in the underlying lawsuit that would support it. It was willing to look behind simply the document that was filed. That's what Mr. Tallone is asking the Court to do, is to simply look at the document that was filed. I think Countrywide Home Loans allows the Court to go a little bit further and to look at the document as it was actually executed, which did not include any of the indicia that is required by the Civil Practice and Remedies Code to provide for a proper acknowledgement of that document. And in the absence of that proper indicia, there was no proper filing of the document. Now, Mr. Tallone has conceded in his briefing that if there is no proper – that if the document is not properly filed, it can't constitute constructive notice. But he quickly turns then from arguing constructive notice to say, well, if it isn't – it puts the third party on inquiry notice. However, there are a number of problems with that argument as well, primarily based in this Court's decision in the Hamilton case, which is cited throughout both of the briefs. The Hamilton case from this Court specifically said that constructive – that the inquiry notice under Texas law is based upon the existence of constructive notice. So if there is no constructive notice, you can't be – you can't put a party on inquiry notice. So as a – right out of the gate, Anlock's position is that neither constructive notice nor inquiry notice can be present in this case based upon that improper filing of the assignment because its impropriety prevented it from ever being constructive notice. But even if the Court were to go a step further and say, well, perhaps it might put on inquiry notice, Hamilton and even one of the cases cited by Mr. Tallone, I believe it was the Frack case – maybe Frick, I'm sorry, I'm not – I don't remember the exact name of it. But that – but those cases put limits on what a party necessarily must inquire into. And if the Court will read Mr. Tallone's brief, what they are asking is that a party looking at this document should have then, instead of just making some – some reference to – to something that was close by, look into a separate – completely separate database of documents, the Secretary of State's documents, to try to determine that Mr. Kallurz was Anlock's manager and therefore would have had authority. We think that goes beyond the bounds of inquiry notice. And it's important also to recognize that the Hamilton case was bounded by its facts. In that case, the Court was dealing with a situation in which there was a properly filed deed of trust in the property records. No allegation, and in fact, the Court noted that it was properly filed. The question in that case was whether a – the failure to file a substitute trustee's deed was – was sufficient to invalidate the assignment. And what the Court said was the properly filed initial deed of trust would be sufficient to put someone on inquiry notice as to saying, well, there's this deed of trust, what's happened to it? So there – there was some potential – potentially some level of inquiry notice, although it's also important to note that in the Hamilton case even, this Court, on the record presented to it, couldn't make that determination and remanded back to the bankruptcy court to make a determination as to the reasonableness of that – that nature of inquiry. So in this situation, we have an – a document which was never properly acknowledged that was admittedly altered by Mr. Tallone in response to the clerk's statement that she couldn't file it to get it into fileable form. The impropriety of that acknowledgement, the impropriety of the filing of that document can't create constructive notice and it can't create an inquiry notice either. And as a final point, as this Court also recognized in Hamilton and as Judge Isker also pointed out, there is an issue of equity here. And the Court has broad equity powers to determine the – whether such an assignment should be deemed to be appropriate or not. And in this case, where it is uncontested that Mr. Tallone altered that document in order to make it filed, and I would point out again, also altered the sharing agreement before he had that filed. So this is not a one-off. This is – this is a pattern or practice by Mr. Tallone. When you refer to alter, you're talking about correcting the deficient acknowledgement that the person should have done who created the document. Well, Judge Wiener, we'll never know whether that's the case or not because Mr. Tallone never bothered to go back to the notary, never bothered to go back to Mr. Kluwers, never checked with anyone. Well, but the clerk of court is what called it to his attention. The clerk of the property record said that she could not file the document as it was. And by correcting the acknowledgement, then she filed it. Well, I said – but, Your Honor, I would say that it's not correcting because the Texas – the – Well, he wasn't a lawyer, but he tried to correct it. Well, he tried to, but he – and the way that he did it does not satisfy the actual acknowledgement statutes because the acknowledgement statutes have specific requirements for the notary that the notary has to either have personal knowledge of the affiant or provide some type form of independent identification. It sounds to a non-Texas lawyer like a Charles Dickens treatment of the law. Well, Your Honor, I actually had – I was talking with someone yesterday and it was – I mentioned the statement that I said earlier that this was not, you know, a till of the hun versus a pack of nuns, and he said it's a little bit more like a rattlesnake versus a water moccasin. And I would concede to the court that this is somewhat Dickensian in the circuitous nature that it's taking. But I would also urge that the acknowledgement statutes are clear in the state of Texas, that they require for an – the notary to properly acknowledge it that either she have personal knowledge, that independent information be given, or that a proper short-form acknowledgement be used. I'm very fortunate because I've got two fine Texas lawyers on this panel. It'll keep me straight. As a Texas lawyer myself, Your Honor, I will say that I believe that always helps quite a bit. All right. Your time has expired, Mr. York. Thank you. Mr. George, you have time for rebuttal. In – Judge Weiner, in answer to your question about whether the acknowledgement statute requires strict compliance or substantial compliance, the statute makes clear multiple places that substantial compliance is what is required. That would be the Texas Civil Practice and Remedies Code 121.006A, which says that under the acknowledgement, the authorization of a form doesn't prevent the use of other forms. So we're not limited solely to the statutory ones. And in addition, Civil Practice and Remedies Code 121.007, which says the form of the acknowledgement must be substantially as follows. So the Texas legislature has stated that substantial is the – is what is required. And I want to briefly discuss kind of the interaction of the various documents to make clear that our – which claims are in play. As we've discussed, we have the sharing agreement, the assignment, and then there was the mechanics lien. The mechanics lien was for a set amount of money, $300,000. That has been waived in order to avoid equitable mootness, a settlement related to that. We agree that is no longer part of the case. The two documents that are part of the case are the assignment and the sharing agreement. The sharing agreement gave the 10 percent interest, carried working interest, in both properties, both of the fields. The assignment, however, was only 6 percent of the Hockley field. So the assignment, which came later, was more limited. Our argument on the assignment is that it is a pre-petition transfer. The assignment is the one that had the language about the – him being president added. Our position was it was a pre-petition transfer and it's what they tried to avoid and the bankruptcy court said was avoided with the strong-arm powers. If we prevail on that, then because it's pre-petition, that is not part of the estate. And because it's not part of the estate, the TEPA argument, we contend, is irrelevant to it. That if we prevail on the assignment having been pre-petition, the court doesn't analyze it with TEPA because the bankrupt had sold it, it can't be taken back, and it entered bankruptcy forever without it. Okay. The sharing agreement, we think, has to be addressed – both of them need to be addressed. The sharing agreement, even if we have the assignment, it's broader because it's 10 percent of two properties, not 6 percent of one. The sharing agreement, the bankruptcy court determined, was not a pre-petition transfer because it wasn't a present conveyance. In other words, it said, if you do this, we'll convey you that. We are not contesting that finding. We are not arguing that the sharing agreement was pre-petition. Instead, it was a contract that the bankruptcy court had to deal with. And that's the one where, if we prevail, we're entitled to the 10 percent of both, and because it contains the words about engineering, the Texas Engineering Practices Act potentially applies. And so our position is, though, we are not barred by that. So that briefly explains the interaction of the various instruments. All right. Thank you, Mr. Jordan. The case is under submission.